FILED

2026 Mar-20  AM 09:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **OVIDIO ALFARO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:22-cv-00333-AMM** |
| | ) | |
| **PRUDENT AMERICAN TECHNOLOGIES, INC., a Foreign Corporation, and MIKE NECESSARY,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>MEMORANDUM OPINION</u>

This case is before the court on cross-motions for summary judgment. Docs. 72, 73.[1] Because there are no disputes of material fact in this case, and defendants Prudent American Technologies, Inc., and Mike Necessary, are entitled to judgment as a matter of law, their motion for summary judgment, Doc. 73, is **GRANTED**. Ovidio Alfaro's motion for partial summary judgment, Doc. 72, is **DENIED**.

### I.  BACKGROUND

Here are the undisputed facts:

---

[1] Because the parties' renewed motions for summary judgment incorporate previously filed motions for summary judgment, the court references those previously filed motions and the contemporaneously filed evidence throughout this opinion.

Prudent American Technologies, Inc., ("Prudent") is a manufacturer of component parts for firearms, with factories in Lexington, Kentucky, and Decatur, Alabama. Doc. 41-4 at 3. At the time of the dispute at issue in this case, Ovidio Alfaro headed operations for Prudent's Decatur factory. *See id.* at 4, 6–7; Doc. 48-2 at 19. Tom Harbison chaired Prudent's board of directors, and other members of company leadership included Reagan Stewart (chief financial officer), Charlie Lemmon (an early organizer of the company who did not otherwise participate in operating the business), and Mike Necessary, chief executive officer. Doc. 41-4 at 3–5.

Mr. Alfaro is a Cuban-American United States Military Academy graduate who has spent his post-military career working in business operations. *See generally* Doc. 48-1; Doc. 48-2 at 6–11. Prudent approached Mr. Alfaro to serve as its chief executive officer after Prudent purchased its Decatur factory from Terrence McCall. Doc. 48-2 at 11–12. Mr. Alfaro declined, the company went on to hire Mr. Necessary, and Prudent again approached Mr. Alfaro in 2019 to serve as the director of operations for the Decatur factory. *Id.* at 12, 16–17, 19. Mr. Alfaro then agreed to join the Prudent team and began working in Decatur. *Id.* at 18.

Mr. Alfaro arrived in Decatur in September 2019. *Id.* He and Prudent had not yet agreed on an employment contract and  were actively negotiating the terms of his employment when he began working in the Decatur factory. *Id.* at 18–20; Doc.

41-4 at 7. Because the parties had not finalized an employment agreement, Mr. Necessary sent Mr. Alfaro back to Texas and the parties continued their negotiations. Doc. 48-2 at 25; Doc. 41-4 at 7. In their briefs, the parties describe this as a suspension, but undisputed evidence establishes that Prudent never formally disciplined Mr. Alfaro or memorialized his "suspension" in writing. Doc. 48-2 at 25, 28. As part of the negotiations over Mr. Alfaro's employment agreement, Mr. Stewart visited Mr. Alfaro in Fort Worth, Texas. Doc 41-4 at 7–9. The parties executed Mr. Alfaro's employment agreement in November 2019. Doc. 38 at 7.

Mr. Alfaro's employment agreement, in its final form, included several provisions relevant here. First, it set the effective date of Mr. Alfaro's employment with Prudent as September 9, 2019. *Id.* at 1. Second, it defined his position as Prudent's "Vice President of Operations in Decatur, Alabama" and represented that he would "perform such duties as are commonly performed by a Vice President of Operations and as may be assigned by the CEO." *Id.* Third, it provided that the contract would continue for a minimum of six months should another company acquire Prudent, and fourth, it defined his compensation. *Id.* As part of Mr. Alfaro's compensation, he received certain "Class B Units" of Prudent stock, "subject to a five-year vesting period as described" in a separate "Equity Grant Agreement." *Id.* at 2.

Fifth, the contract provided for temporary housing reimbursements for Mr. Alfaro, as he was moving from Texas, for expenses relating to his move, and for certain travel expenses. *Id.* Finally, the contract set terms should Prudent choose to terminate Mr. Alfaro. *See id.* at 2–5.

Mr. Alfaro pored over his employment agreement and proposed numerous changes before it was finalized. *See* Doc. 38-1 at 3. Most of Mr. Alfaro's proposed changes were incorporated into his final employment contract. *Compare id.* at 3, *with* Doc. 38 (reflecting that some but not all of Mr. Alfaro's changes became part of his employment contract). Mr. Alfaro proposed to set a date certain by which his Class B Units of Prudent stock would be delivered to him via an Equity Grant Agreement, Doc. 38-1 at 3, and that proposed provision did not become part of his final employment contract, *see* Doc. 38 at 2.

Mr. Alfaro's employment contract expressly provides that it is the "Entire Agreement" between the parties:

> No agreements or representations, oral or otherwise, express or implied, with respect to the Employment or any of the subjects covered by this Agreement have been made by either party that are not set forth expressly in this Agreement and this Agreement supersedes any pre-existing employment offers, agreements and any other agreements on the subjects covered by this agreement.

*Id.* at 6.

After executing his employment contract in November 2019, Mr. Alfaro returned to Decatur and assumed his role as director of operations for the factory. *See* Doc. 48-2 at 28. His employment ultimately lasted just a year and was filled with dissention and disagreements with Mr. Necessary. *See id.* at 55.

Beginning in January 2020, Mr. Alfaro repeatedly expressed his displeasure with Mr. Necessary's leadership to Prudent's board and to Mr. Necessary. Doc. 48-3 at 10–11. On several occasions, Mr. Alfaro wrote letters or emails to Mr. Necessary describing his perceived lack of leadership and failure to set appropriate operational objectives for the Decatur team. *See* Doc. 48-6 at 43–58; Doc. 39 at 1–4; Doc. 39-3 at 2–4, 6–7; Doc. 40–3 at 1–3; Doc. 40–4 at 1–3; Doc. 40–5 at 1–5. Mr. Alfaro organized a meeting between members of the Decatur team and Mr. Necessary, for which Mr. Alfaro prepared a detailed agenda and meticulously described his frustrations with Mr. Necessary's leadership. Doc. 39 at 1–4. Mr. Necessary, in a note to himself,  said that meeting was a "blind side" and lamented Mr. Alfaro's "finger pointing and [lack of] interest in discussing solutions, [instead] only . . . focus[ing] on the negative." Doc. 39-1.

Although Mr. Necessary thereafter acknowledged that the team in Decatur "love[d]" Mr. Alfaro, Doc. 40, and commended the Decatur team's successes, Doc. 40-1, he recognized that Mr. Alfaro's repeated overtures were "disruptive," and his "delivery [was] out of line," Doc. 40. So Mr. Necessary and members of the board

began discussing Mr. Alfaro's future with Prudent. *See* Doc. 40-2 at 1–2. Mr. Necessary escalated the discussion to this level after Mr. Alfaro rebuffed his guidance on COVID-19 protocols in the Decatur facility. *See id.* at 2–8. He wrote Mr. Harbison and Mr. Lemmon that he "ha[d] been patient" with Mr. Alfaro's "combative nature" before acknowledging that his "'drawers' [might be] in a wad for all the wrong reasons" and asking for Mr. Harbison and Mr. Lemmon to "offer perspective and to set [him] straight if [he was] out of line." *Id.* at 2. Mr. Lemmon responded and acknowledged a "pattern" of difficult behaviors from Mr. Alfaro, including the difficulty in negotiating his employment agreement and his "insubordination" in "written communications directed towards" Mr. Necessary. *Id.* at 1. Nevertheless, Prudent took no action because the company needed to obtain a new lease in Decatur and "[t]o take personnel actions prior to a lease extension [was] likely suicide." *Id.* at 2.

Less than a month after these discussions among Prudent leadership, Mr. Alfaro sent Mr. Necessary a letter wherein he criticized a "lack of convincing decision-making" and Mr. Necessary's "lack of trust, insufficient reasoning, uninspiring dialogue, combative propositions, uncertainty, confusion, and more micromanagement." Doc. 40-3 at 3. Shortly after that, Mr. Alfaro sent another letter to Mr. Necessary on September 11, 2020, bemoaning "an absence of a credible strategy and mission/vision statements." Doc. 40-4 at 2. In his letters, Mr. Alfaro

6

often refers to actions taken by Mr. Necessary as "discrimination." Doc. 40-3 at 3; Doc. 39-3 at 3.

Tensions between Mr. Necessary and Mr. Alfaro then reached a tipping point. On September 14, 2020, Mr. Necessary emailed the Decatur team about production goals given new manufacturing opportunities, and Mr. Alfaro responded that his "repeated inquests are tiring **ALL OF US**." Doc. 40-5 at 3–5. Mr. Alfaro said that Mr. Necessary's approach was "disqualifying." *Id.* at 4.

Prudent leadership then decided to fire Mr. Alfaro, and Mr. Harbison and Mr. Stewart made a trip to the Decatur facility to carry out the task in person. *See* Doc. 48-2 at 55. When they arrived, Mr. Alfaro returned home and retrieved a "cure letter" that he had addressed to the company. *Id.* In his letter, Mr. Alfaro stated that he would resign in thirty days unless the company cured (1) reductions in his "relative position with the Company [effected] by hiring another individual to assume material portions of [Mr. Alfaro's] responsibilities," (2) reductions in his agreed-upon compensation based on Prudent's "disparate bonus program," (3) perceived failures to implement strategies and objectives for Mr. Alfaro and the Decatur team, and (4) Mr. Alfaro's Equity Grant Agreement, which the parties had not jointly executed as of September 2020. Doc. 40-6. Mr. Alfaro delivered this letter to Mr. Harbison and Mr. Stewart when they fired him. Doc. 48-2 at 56.

Prudent presented Mr. Alfaro a separation agreement that paid him thirteen months of his full salary as severance and offered $10,000 for his 1% ownership interest in Prudent's Class B Units. Doc. 40-7 at 2. The parties never executed a severance agreement. Doc. 48-2 at 59. And then Mr. Alfaro filed this lawsuit.

Mr. Alfaro brought claims against Prudent for breach of contract and employment discrimination, and he brought claims against Mr. Necessary for tortious interference with a contract and employment discrimination. Doc. 19 ¶¶ 27–50. The parties conducted discovery, but this case was stayed after Prudent filed for bankruptcy in 2023. Docs. 62, 64. That proceeding has concluded, and the parties filed renewed motions for summary judgment, incorporating their previous, fully-briefed motions. Docs. 49, 50, 51, 72, 73.

## II. LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts "affect the outcome of [a] suit." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute about those facts is genuine if a reasonable jury could find for the non-movant. *Id.*; *see also Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) ("For factual issues to be considered genuine, they must have a real basis in the record.").

If a party cannot produce evidence that supports their claims, summary judgment is proper. *See* Fed. R. Civ. P. 56(c). "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023) (cleaned up). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment[] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

### A. Employment Discrimination

Mr. Alfaro and defendants both argue that they are entitled to summary judgment on Mr. Alfaro's employment discrimination claims.

#### 1.   Alfaro's Motion for Partial Summary Judgment

Mr. Alfaro contends that he is entitled to summary judgment because he has shown that he was engaged in protected conduct and suffered adverse employment action. *See* Doc. 50 at 8–9. Mr. Alfaro does not identify which claims in his complaint are the subject of his summary judgment motion. *See id.* at 8. He asserts that Prudent "knew that [he] had complained of discrimination [and] yet did nothing." *Id.* And that "[s]oon afterward, large portions of [Mr. Alfaro's] responsibilities were removed by Defendant Mike Necessary[,] who continued his

harassment towards [Mr. Alfaro]." *Id.* Therefore, he asks for summary judgment on his "retaliation claim." *Id.* at 9.

But Mr. Alfaro's submission is insufficient to carry his burden under Federal Rule of Civil Procedure 56, which requires the moving party to "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that prove the undisputed facts, or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Mr. Alfaro has not done so—his briefing on this issue cites no evidence and covers roughly one page. *See* Doc. 50 at 8–9. As such, Mr. Alfaro's motion for summary judgment on his employment claim, Doc. 49, is **DENIED**.

### 2. Prudent and Mr. Necessary's Motion for Summary Judgment

Prudent and Mr. Necessary contend that they are entitled to summary judgment on Mr. Alfaro's employment claims because "[t]he record is devoid of evidence supporting the conclusion that Prudent [] or [Mr.] Necessary discriminated against or harassed Alfaro on the basis of his race or national origin." Doc. 51 at 22.

Mr. Alfaro brings claims against Prudent under Title VII (42 U.S.C. § 2000e-2), and against Mr. Necessary under 42 U.S.C. § 1981. *See* Doc. 19 ¶¶ 27–44. The

10

former provides that an employer may not "fail or refuse to hire or . . . discharge any individual, or otherwise [] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). And the latter provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," a "right[] protected . . . against impairment by nongovernmental discrimination." 42 U.S.C. § 1981(a), (c).

Title VII "outlaws employment discrimination because of race, color, religion, sex, or national origin," and Section "1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943–44 (11th Cir. 2023) (cleaned up). "To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both." *Id.* at 944.

"Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (cleaned up). It is evidence "composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Id.* (cleaned up).

11

In the absence of direct evidence, a plaintiff can carry their burden by demonstrating a "'convincing mosaic'" of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc). This standard is decidedly broader than a "pretext inquiry" and instead asks if the plaintiff has "put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination or retaliation." *Ismael v. Roundtree*, 161 F.4th 752, 762–63 (11th Cir. 2025) (cleaned up).

Separately, a plaintiff can attempt to satisfy the *McDonnell Douglas* balancing test to survive a motion for summary judgment against a claim of intentional discrimination. In *McDonnell Douglas Corp. v. Green*, the Supreme Court established a burden-shifting framework in which the plaintiff makes a *prima facie* showing of discrimination by proving that they belong to a protected class and that they suffered an adverse employment action. 411 U.S. 792, 802 (1973). If the plaintiff makes that showing, the employer must then proffer a "legitimate, non-discriminatory reason" for their actions. *Id.* "[S]hould the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination . . . ." *Lewis*, 918 F.3d at 1221.

Mr. Alfaro's only direct evidence is his testimony. When Mr. Alfaro was questioned directly about his allegations of discrimination, he testified:

Q. [Y]ou state that Mr. Necessary discriminated against you and your team. What did you mean by that?

A. Well -- okay. So bottom line is when -- in the case that we're discussing here, he made a commitment. He didn't honor it. He's bringing it to us. And, again, disrespectful, negligent and discriminating. I don't know why he would make a commitment and not honor it. Something so simple, all he had to do was take an hour to be mindful and have a good conversation. Why didn't he do it, that's for Mike to answer. Why would a man make a commitment and not honor it?

Q. Do you have any other thoughts on -- or examples of -- to back up your allegation that [Mr. Necessary] discriminated against members of your team?

A.: If I thought long and hard about it and if I could pose others, we could probably come up with some examples, but right now I don't have anything. But if you were to give me the time to think and pursue some things, we could probably share those with you.

Q. Can you, as you sit here today, identify the names of any of your team members that you allege Mr. Necessary discriminated against?

A. Well, in this -- in this particular case where we're talking about Melinda and not involving Melinda -- and that's to whom I would have referred because this is really impacting her. Now, did he discriminate against her because she's a female? Because she's married to Terrance McCall? I don't know. But it's difficult to accept neglect, uncommitment [sic] and discrimination. It's generally not how you would treat people that you respect.

. . .

Q. Is it fair to say, just so I understand when you use the term "discriminate," that she was discriminated against

13

and you were discriminated against because he told you one thing and did another and that he didn't include you in the decision-making process?

A. The answer is yes. And the reason why is because I have a question. Why would he not include me? That's -- that's just . . . .

Doc. 37 at 43.

Later in his deposition, Mr. Alfaro testified Mr. Necessary discriminated against him and his team "[b]y neglect and not commitment, you bet." *Id.* at 44. When asked "what did [Mr. Necessary] say that was discriminatory?" Mr. Alfaro responded:

He neglected. He would say that he's going to do A, B[,] and C. We have already talked about a couple of examples. Why would he not follow up on his commitment? Why would he choose to personal -- purposefully neglect? . . . Hey, you were going to follow up with me, and you didn't.

*Id.* at 45–46. And when pressed a final time about what Mr. Necessary said to him that was discriminatory, Mr. Alfaro responded:

That he didn't believe the numbers on my spreadsheet. . . . [W]hy would he say that? Mark, why would a man say that? "I don't believe the numbers." But he said it to me. He singled me out. And the spreadsheet that I produced, not only was it great to the second, but why would he do that? Because he had a stopwatch and he didn't look at the program? Why would he single me out? Why would he, in layman's terms, punk me out when all I was doing was everything professionally to the extent that I was willing to publish it all? Just unfair.

*Id.* at 46.

14

Mr. Alfaro's testimony is not and reflects no direct evidence of intentional race-based discrimination. It indicates that Mr. Alfaro feels that he was mistreated by Mr. Necessary and by Prudent, but it does not prove—or even suggest—the existence of intentional race-based discrimination. *See Schoenfeld*, 168 F.3d at 1266. Further, Mr. Alfaro identifies no evidence that Mr. Necessary or anyone at Prudent ever referenced his race. And he offers no response to defendants' argument that the record contains no evidence of discrimination.

In fact, the only evidence in the record about race cuts against Mr. Alfaro's claims: Mr. Alfaro testified that a White female co-worker (Melinda McCall) suffered the same "neglect" that Mr. Alfaro complains of. Doc. 48-2 at 25; Doc. 46-1 at 5; *see* Doc. 52-5 at 2–3; Doc. 52-8 at 2–4.

Likewise, Mr. Alfaro does not show a convincing mosaic of discrimination. *Lewis*, 918 F.3d at 1220 n.6; *Ismael*, 161 F.4th at 762–63. His circumstantial evidence is that he wrote letters to Mr. Necessary and communicated to the Board that he felt Mr. Necessary's actions were discriminatory. But that evidence suggests only what is already obvious and not in dispute—Mr. Alfaro disagreed with Mr. Necessary's vision for the direction of Prudent's Decatur facility. There is no evidence that Mr. Necessary failed to respond to Mr. Alfaro's complaints or canceled meetings with him more frequently or on different footing with his White counterparts. Mr. Necessary's notes indicate that the Decatur facility "love[d]" Mr.

15

Alfaro, but that Mr. Alfaro's repeated outbursts were "disruptive" and his "delivery [was] out of line." Doc. 40. It strains credulity to suggest that Mr. Alfaro's letters, or any of Mr. Necessary's notes-to-self, support a reasonable inference of intentional race-based discrimination.

Undisputed evidence establishes that Mr. Alfaro and Mr. Necessary did not get along. But there is no evidentiary basis for an inference that their failure to get along was the product of intentional race-based discrimination by Mr. Necessary.

Finally, the court evaluates whether Mr. Alfaro can satisfy the burden-shifting test the Supreme Court established in *McDonnell Douglas*. Mr. Alfaro has carried his initial burden of proving a *prima facie* case of discrimination by demonstrating that he is a part of a protected class and that he suffered adverse employment action: he is Cuban-American, *see* Doc. 48-1, and he was fired from his job at Prudent.

To prove that they had legitimate, non-discriminatory reasons for terminating Mr. Alfaro, the defendants argue that Mr. Alfaro was insubordinate. As evidence, they cite Mr. Alfaro's fierce disagreements with Mr. Necessary and Prudent leadership, which began immediately after he commenced his employment. Mr. Alfaro escalated his grievances with Mr. Necessary to Mr. Harbison, the chairman of Prudent's board, directly. Doc. 41-4 at 4; Doc. 48-2 at 34–35. And he aired his complaints with Mr. Necessary in front of the entire Decatur leadership team. *See* Doc. 39. Mr. Alfaro also wrote pointed and increasingly hostile letters to Mr.

16

Necessary sharply criticizing his leadership, accusing him of neglect and discrimination, and stating that Mr. Necessary's "repeated inquests are tiring **ALL OF US**." Doc. 40-5 at 3. In another exchange, Mr. Alfaro refused Mr. Necessary's suggestion that the Decatur facility adopt COVID-19 precautions in line with Mr. Necessary's expectations as the leader of the company. Doc. 40-2 at 2–7. Mr. Alfaro does not dispute that any of these incidents occurred. Undisputed evidence of the discussions amongst key leaders at Prudent as they considered firing Mr. Alfaro is in accord: Prudent's leaders recounted Mr. Alfaro's communications referenced above and agreed that the company should move forward with terminating him, even knowing that they would have to pay him a sizeable severance package. *See id.* at 1–2; Doc. 41-4 at 17–18.

This corpus of undisputed evidence is sufficient to establish that the company had sufficient, non-discriminatory reasons for terminating Mr. Alfaro's employment.

Mr. Alfaro offers no meaningful response to this evidence and makes no effort to show that Prudent's actions were merely pretextual. Mr. Alfaro's response to defendants' summary judgment briefing on this issue spans half a page and does not engage with defendants' substantive arguments. *See* Doc. 60 at 4–5. Accordingly, defendants' motion for summary judgment on Mr. Alfaro's employment claims, Doc. 51, is **GRANTED**.

17

## B. Breach of Contract

Mr. Alfaro and Prudent both argue that they are entitled to summary judgment on Mr. Alfaro's breach of contract claim. Docs. 50, 51. Mr. Alfaro argues that when Prudent failed to deliver his Equity Grant Agreement timely and failed to consider his cure letter, Prudent breached his employment agreement. Doc. 50 at 7–8. Prudent argues that Mr. Alfaro cannot prove his own performance or damages, and Prudent is therefore entitled to judgment as a matter of law. Doc. 51 at 16–21.

Under Alabama law, a claim for breach of contract has four elements. *Ex parte Am. Heritage Life Ins. Co.*, 46 So. 3d 474, 477 (Ala. 2010). A plaintiff must prove the existence of a valid contract, their own performance, the defendant's nonperformance, and damages. *Id.* Contracts are interpreted as written. *Ex parte S.C. Ins. Co.*, 683 So. 2d 987, 989 (Ala. 1996). And "[a] plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens." *S. Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1134 (Ala. 2000).

The parties executed a valid employment contract on November 1, 2019, after extensive negotiations. Doc. 48-5 at 8. Mr. Alfaro argues that Prudent breached that contract by belatedly delivering his Equity Grant Agreement. Doc. 50 at 7. Prudent argues that it has performed its end of the contract and is therefore entitled to summary judgment in its favor. Doc. 51 at 16–21.

The Equity Grant Agreement provision of his employment contract provides:

18

> **Equity Grant.** The Class B Units granted to the Executive will be equal to a 1.0% Percentage Interest (as such term is defined in the Company's Equity Grant Agreement) in Prudent American Holdings, LLC, subject to a five-year vesting period as described in the Company's Equity Grant Agreement.

Doc. 38 at 2. This provision does not require Prudent to deliver the Equity Grant Agreement within a specified timeframe. No other provision of the contract imposes a specific time frame, either. And Mr. Alfaro's employment contract contains a clause stating that it is the "Entire Agreement" between the parties—that is, there are no other "side deals." Doc. 38 at 6.

Mr. Alfaro testified to his belief that his conversations with Mr. Stewart bound the corporation to deliver his Equity Grant Agreement by December 1, 2019, Doc. 48-2 at 31, but he offers no legal or evidentiary basis to conclude that there was a separate agreement that bound Prudent to deliver the Equity Grant Agreement by a date certain, *see* Doc. 60 at 5. And in the end, Mr. Alfaro received the equity he was promised in his employment agreement. Indeed, Prudent's deposition establishes that Mr. Alfaro still owns equity in the company. Doc. 48-3 at 24. Prudent fulfilled its contractual obligations to Mr. Alfaro with respect to the equity grant in his employment contract, and his arguments to the contrary are unsupported.

Next, Mr. Alfaro contends that the company breached his employment agreement by failing to consider his "cure letter." Doc. 50 at 8. Mr. Alfaro's

19

employment agreement contains the following provisions regarding termination at will without a "cure period":

> (b) **Termination With Severance Pay.** Executive shall not be entitled to any further compensation from the Company after termination of the Employment as permitted by this section, except (A) unpaid salary installments through the end of the week in which the Employment terminates; (B) any vested benefits accrued (e.g., health insurance and other fringe benefit programs, unused and accumulated carry-forward vacation, earned bonuses up to date of Termination, and equity grants) before the termination of Employment under the terms of any written Company policy or benefit program; and (C) any Severance Pay to which Executive is entitled under Section 6, which will be paid to Executive on Company's regular payroll schedule.
>
> . . .
>
> ii. **Discretionary Termination by the Company.** The Company may terminate the Employment at will and in its sole discretion, but in such case the Executive will be entitled to Severance Pay as outlined in Section 6 below, under one of the following categories: (1) discretionary with Cure Period and (2) discretionary without Cure Period (for immediate termination, reorganization, or elimination of position).

Doc. 38 at 3–4.

Because Prudent admits that it fired Mr. Alfaro without cause and offered him no opportunity to cure deficiencies in his employment, Doc. 48-3 at 18, Section 6 of the employment agreement governs Mr. Alfaro's severance pay. It provides:

> 6. **Severance Pay.** The Company will pay and provide Executive with the payments provided in this section

("Severance Pay") if Executive's Employment is terminated [without cause].

(a) **Amount and Duration of Severance Pay.** Subject to the other provisions of this section, Severance Pay will consist of:

i. **Salary Continuation.** Payments will be made in substantially equal installments, less required tax deductions and withholdings, pursuant to the Company's normal payroll practices and on the Company's regular pay dates. Continuation of Executive's Base Salary for:

. . .

[3] **Discretionary** **without** **Cure** **Period** is a period of twelve (12) months after termination of Employment plus an additional one (1) month of Executive's Base Salary for each year and for each partial year of employment Executive has completed with the Company measured from the Effective Date of this Agreement. Monthly increments for time of employment will be capped at twelve (12) months for twelve (12) years of employment. For example, if the Executive was employed for two (2) years and one (1) day, the Executive will receive fifteen (15) months of continued base salary.

. . .

(b) **Conditions to Severance Pay.** To be eligible for Severance Pay, Executive must meet the following conditions: (A) Executive must comply with Executive's obligations under this Agreement that continue after termination of the Employment; (B) Executive must promptly sign and continue to honor a release, in a form mutually drafted by the Company and the Executive, of any and all claims arising out of or relating to Executive's employment or its termination and that Executive might otherwise have against the Company, Company's affiliates (defined as any entity controlling, controlled by

21

> or under common control with the Company), or any of their officers, directors, employees and agents, provided that the release will not waive Executive's right to any payments due under this section; and (C) Executive must resign upon written request by the Company from all positions with or representing the Company or any affiliate, including but not limited to membership on boards or committees.

Doc. 38 at 4–5. Under provision 6(a)(i)([3]) above, Prudent was required to pay Mr. Alfaro thirteen months of his salary after Mr. Alfaro executed a mutually agreed upon release.

Undisputed evidence establishes that upon firing Mr. Alfaro, Prudent tendered to him a severance agreement providing these benefits:

- $184,166.67 of severance compensation, equal to thirteen months of Mr. Alfaro's base pay;

- $10,000 for Mr. Alfaro's Class B Units of Prudent stock;

- Continued health insurance coverage throughout the severance period;

- And $25,000 allowance for a "career transition service" to assist Mr. Alfaro in finding new employment.

Doc. 40-7 ¶¶ 2–5. Undisputed evidence also establishes that Mr. Alfaro did not sign the severance agreement, even after negotiations with Prudent, Doc. 37 at 61, and was thus never paid the severance that his employment agreement provided him, *see id.* at 58–59.

22

Mr. Alfaro fails to recognize that under his employment agreement, his execution of the severance agreement (more particularly, the release) was required for him to receive severance pay. *See* Doc. 38 at 5. By bringing this suit, Mr. Alfaro is attempting to reap the severance benefits that his employment agreement provides without recognizing the burdens that the contract imposes to receive those benefits. *See S. Energy Homes, Inc.*, 772 So. 2d at 1134. Prudent did not breach the employment agreement by tendering a compliant severance agreement to Mr. Alfaro only for him to refuse to sign it. Accordingly, summary judgment is **DENIED** as to Mr. Alfaro's claim for breach of his employment contract and **GRANTED** in favor of Prudent.

### C. Tortious Interference with a Written Contract

Mr. Alfaro's only remaining claim is tortious interference with a written contract against Mr. Necessary. Under Alabama law, the elements of tortious interference with contractual relations are: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). A contract is a protectible business relationship. *See Ex Parte Ala. Dep't of Transp.*, 764 So. 2d 1263, 1270 (Ala. 2000).

Prudent argues that it is entitled to summary judgment on Mr. Alfaro's tortious interference claim because Mr. Alfaro has not identified with particularity any evidence that supports his claims. *See* Doc. 51 at 34–36. Mr. Alfaro apparently "base[s] [his] tortious-interference claim on the same operative facts as those supporting his discrimination and harassment claims" and responded to Prudent's discovery indicating as much. *Id.* at 34–35; Doc. 45-6 at 5. In his response to Prudent's motion for summary judgment, Mr. Alfaro does not discuss his tortious interference claim. *See* Doc. 60.

Prudent's motion for summary judgment as to Mr. Alfaro's intentional interference claim is due to be granted. Mr. Alfaro has produced no evidence to satisfy the elements of tortious interference under Alabama law. Undisputed evidence shows that his claims fail for many reasons. For example, Mr. Alfaro has produced no evidence suggesting that Mr. Necessary intentionally interfered with his employment contract such that he suffered damages. Mr. Alfaro's evidence, taken in the light most favorable to him, suggests that Mr. Necessary discussed his termination with Prudent's board because he did not get along with Mr. Alfaro. Doc. 40-2 at 1–2. But Mr. Alfaro had no right to continued employment with Prudent: because his employment agreement expressly designates him as an "at-will" employee, Prudent could terminate him at any time. Doc. 38 at 4. Further, there

is no evidence to suggest that Mr. Necessary intentionally interfered with Mr. Alfaro's contractual rights to severance.

Accordingly, no reasonable jury could find for Mr. Alfaro on this claim, and Prudent's motion for summary judgment on Mr. Alfaro's tortious interference claim is **GRANTED**.

### D. The Motions to Strike and Objections

The parties both object to certain evidence relied on in support of the cross-motions for summary judgment. Mr. Alfaro moves to strike evidence of negotiations between himself and defendants over the terms of his severance agreement. *See* Doc. 60 at 2. And the defendants object to references to the operative complaint in Mr. Alfaro's motion for summary judgment and to portions of an affidavit that Mr. Alfaro attached to his motion for summary judgment. *See* Doc. 57 at 1–2.

The court did not consider this evidence in deciding the cross-motions for summary judgment because those motions were resolved on the basis of undisputed evidence. As such, the motions to strike and objections are **DENIED AS MOOT**.

## IV.   CONCLUSION

Based on the foregoing, Mr. Alfaro's motion for summary judgment, Doc. 72, is **DENIED**, and defendants' motion for summary judgment, Doc. 73, is **GRANTED**. A final judgment consistent with this opinion will be entered.

**DONE** and **ORDERED** this 20th day of March, 2026.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE